Marc C. Forsythe – State Bar No. 153854
**GOE & FORSYTHE, LLP**
18101 Von Karman Avenue, Suite 1200
Irvine, CA 92612
mforsythe@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Proposed Attorneys for BP Fisher Law Group, LLP

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>BP FISHER LAW GROUP, LLP,<br><br>          Debtor and Debtor in<br><br>Possession. | Case No. 8:19-bk-10158-TA<br><br>Chapter 11<br><br>**DEBTOR'S SUR-REPLY IN OPPOSITION TO MOTION BY DITECH FINANCIAL, LLC TO DISMISS, OR IN THE ALTERNATIVE, TO TRANSFER VENUE; DECLARATIONS OF MATTHEW C. BROWNDORF AND MARC C. FORSYTHE IN SUPPORT THEREOF**<br><br>Hearing Date: February 27, 2019<br>Time:              10:00 a.m.<br>Courtroom:     5B<br>                      United States Bankruptcy Court<br>                      411 West Fourth Street<br>                      Santa Ana, CA 92701 |

1    The threshold issue before this Court is whether venue in this district is proper under 28

2    U.S.C. § 1408.  Debtor has plainly established that venue in this district is proper because

3    (1) Debtor's "nerve center" is located in this district, and (2) Debtor's general partner is located in

4    this district.  Each is an independent and sufficient basis to establish venue and deny Ditech's

5    motion. Ditech has not—and cannot—refute these facts.  Instead, Ditech now challenges the

6    Debtor's very existence by arguing that the Debtor's "entire enterprise is organized in violation of

7    [Maryland's] professional responsibility rules." (Reply Br., p. 2.) This argument lacks both factual

8    accuracy and legal merit.  Accordingly, Ditech's motion should be denied as venue in this district

9    is proper.

10   **I.    DEBTOR'S GENERAL PARTNER IS LOCATED IN CALIFORNIA AND HAS A**

11   **PENDING CHAPTER 11 BANKRUPTCY CASE IN THE CENTRAL DISTRICT OF**

12   **CALIFORNIA**

13   The Debtor's general partner is LF Runoff 2, LLC, fka Plutos Sama, LLC ("LF").  The

14   Debtor's operative partnership agreement[1] provides that the general partner is Matthew Browndorf

15   for any state that requires the general partner to be an individual. (*See* Declaration of Matthew

16   Browndorf ¶ 2, **Exhibit A**.)  Both LF and Browndorf are located within this district.  LF is

17   physically located in Irvine, California, and Browndorf has, at all relevant times, owned real

18   property and been domiciled in Orange County, California. These facts are undisputed.

19   Furthermore, LF filed a Chapter 11 bankruptcy petition on February 14, 2019 in the

20   Central District – Case # 8:19-bk-10526-CB (the "LF Bankruptcy Case").  The LF Bankruptcy

21   Case has been transferred to Judge Albert, an Order Setting Scheduling and Case Management

22   Conference has been entered (LF Bankruptcy Case, Docket No. 8), and the Initial Debtor

23   Interview ("IDI") has already occurred on February 22, 2019 (on the same day that Debtor

24   attended its 341a meeting of creditors).  See Declaration of Marc C. Forsythe, ¶ 2, attached hereto

25   and incorporated herein by this reference ("Forsythe Dec.").

26

27

28

---

[1] Third Amended and Restated Limited Liability Partnership Agreement, BP Fisher Law Group, Effectively Dated
February 22, 2018.

2

1    At the IDI in the LF Bankruptcy Case (Debtor already attended its IDI on January 31,

2    2019), the UST, Debtor and counsel for the debtor in the LF Bankruptcy Case agreed to move the

3    341a meeting in the LF Bankruptcy Case to March 5, 2019 to follow the second 341a meeting in

4    the Debtor's case at 10 a.m. on March 5, 2019.  On February 22, 2019, Goe & Forsythe, LLP

5    mailed out over 500 notices to creditors in both bankruptcy cases.  See Forsythe Dec., ¶ 3.

6    Debtor has filed its Schedules and Statement of Financial Affairs and expects to be in full

7    compliance with UST Guidelines this week.  See Forsythe Dec., ¶ 4.

8  **II.**      **MARYLAND'S PROFESSIONAL RESPONSIBILITY RULES DO NOT APPLY**

9    Ditech's reliance on Maryland's professional responsibility rules is improper. With limited

10    exceptions not relevant here, the Rules expressly prohibit parties from invoking an alleged

11    violation as a "procedural weapon" outside the administration of a disciplinary authority:

12    

13    

14    

15    

16    

> Violation of a Rule does not itself give rise to a cause of action against an attorney nor does it create any presumption that a legal duty has been breached. . . Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for an attorney's self-assessment, or for sanctioning an attorney under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

17    

18    (Md. Rule 19-300.1, Preamble, n.20.) Ditech simply has no standing to seek enforcement of any

    alleged violation.

19    

20    More importantly, however, Ditech's interpretation of the Rules is plainly incorrect and

    would invalidate the existence of nearly all multi-state law firms. Law partnerships are routinely

21    

22    comprised of lawyers licensed to practice in different states.  Neither the ABA Model Rules nor

    any state's local rules require *all* partners to be licensed to practice in *all* states.

23    

24    Ditech erroneously cites *Peterson v. Anderson*, 155 Ariz. 108, 745 P.2d 166 (1987) for the

    claim that "courts in other jurisdictions have held a lawyer licensed in another state is a 'non-

25    

26    lawyer' for purposes of § 5.4 of the ABA Model Rules." First, *Peterson* discusses only § 5.4(a)

    which relates to fee-sharing agreements and not § 5.4(b) which relates to formation of

27    

28    partnerships. It is therefore completely inapplicable to the present case.

1    Moreover, in *Peterson*, there was no partnership or other professional relationship between

2    the out-of-state attorney and the local attorney who prosecuted the case, *i.e.*, they were not

3    members of the same firm.  In contrast, where a formal partnership agreement exists, courts

4    invariably reject the *Peterson* analysis and hold that out-of-state lawyers are "lawyers" for

5    purposes of § 5.4 of the ABA Model Rules. *See, e.g.*, *Tomar, Seliger, Simonoff, Adourian &*

6    *O'Brien, P.C. v. Snyder*, 601 A.2d 1056, 1058 (Del. Super. Ct. 1990) ("Although [attorneys] were

7    not licensed to practice law in Delaware, they were members of the New Jersey Bar and were,

8    therefore, "lawyers" for purposes of Rule 5.4(a)."); *Daynard v. Ness, Motley, Loadholt,*

9    *Richardson & Poole, P.A.*, 188 F. Supp. 2d 115 (D. Mass. 2002) (law professor working in

10   Massachusetts but licensed in New York not barred from seeking to enforce agreement with

11   Mississippi and South Carolina lawyers; policy concerns of Rule 5.4(a) not implicated).

12   Therefore, Browndorf is a "lawyer" and his membership does not invalidate the Debtor's

13   partnership agreement.

14   **III.    DITECH'S PREFERENCE IS INSUFFICIENT BASIS TO TRANSFER CASE**

15   As shown above and in prior briefing, venue in this district is clearly proper under 28

16   U.S.C. § 1408.  Ditech's purported preference to have this case transferred to Maryland is an

17   insufficient basis for transfer under 28 U.S.C. § 1412.  If venue in Maryland is so critical to

18   Ditech, then why did they file their Chapter 11 case in the Southern District of New York?  The

19   undisputed facts establish that Debtor conducts its business and operations, both with a physical

20   and non-physical presence, from multiple jurisdictions.  Debtor's clients are national, and none are

21   headquartered in Maryland.  Debtor's general partner is located in California where all of its

22   principals and key corporate decision makers reside and work.  Not even Ditech maintains its

23   principal place of business in Maryland.  Ditech has neither carried its burden nor in any way

24   sufficiently established any basis to disturb the Debtor's present choice of forum.  Accordingly,

25   Ditech's request to transfer venue should be denied.

26   / / /

27   / / /

28

1

2      **IV.**      <u>**CONCLUSION**</u>

3            For the foregoing reasons, Debtor respectfully requests that the Court deny Ditech's

4      Motion and grant any such other relief that the Court deems appropriate.

5

6      Dated:  February 25, 2019                                  Respectfully submitted by
                                                                   GOE & FORSYTHE, LLP
7

8                                                                  By: */s/Marc C. Forsythe*                    
                                                                      Marc C. Forsythe
9                                                                     Proposed Attorneys for BP Fisher Law
                                                                      Group, LLP, Debtor and Debtor in
10                                                                    Possession

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### DECLARATION OF MATTHEW C. BROWNDORF

2

I, Matthew C. Browndorf, pursuant to 28 U.S.C. §1746, declare as follows:

3

1.    The operative partnership agreement of BP Fisher Law Group, LLP is that certain

4

Third Amended and Restated Limited Liability Partnership Agreement of BP Fisher Law Group,

5

Effectively Dated February 22, 2018 (the "LLP Agreement").  A true and correct version of the

6

LLP Agreement is attached hereto as **Exhibit A**.

7

2.    The LLP Agreement defines "General Partner" as follows:

8

"General Partner" means Plutos Sama, LLC, a limited liability company formed

9

under the law of the State of Delaware or any successor general partner admitted
to the Partnership in accordance with the terms of this Agreement. For any state

10

requiring that the General Partner be an individual, the General Partner means
Matthew C. Browndorf, Esquire.

11

12

I declare under penalty of perjury under the laws of the United States of America that the

13

foregoing is true and correct to the best of my knowledge.

14

Executed this 25th day of February 2019, in Irvine, California.

15

16

_____

17

Matthew Browndorf

18

19

20

21

22

23

24

25

26

27

28

1

### DECLARATION OF MARC C. FORSYTHE

2
I, Marc C. Forsythe, declare and state as follows:

3
1.      I am a partner at Goe & Forsythe, LLP, proposed counsel for debtor and debtor in

4
possession ("Debtor").  The matters stated hereinafter are within my personal knowledge, and if

5
called upon as a witness, I could and would competently testify thereto.

6
2.      LF filed a Chapter 11 bankruptcy petition on February 14, 2019 in the Central

7
District – Case # 8:19-bk-10526-CB (the "LF Bankruptcy Case").  The LF Bankruptcy Case has

8
been transferred to Judge Albert, an Order Setting Scheduling and Case Management Conference

9
has been entered (LF Bankruptcy Case, Docket No. 8), and the Initial Debtor Interview ("IDI")

10
has already occurred on February 22, 2019 (on the same day that Debtor attended its 341a meeting

11
of creditors).

12
3.      At the IDI in the LF Bankruptcy Case (Debtor already attended its IDI on January

13
31, 2019), the UST, Debtor and I, as counsel for the debtor in the LF Bankruptcy Case, agreed to

14
move the 341a meeting in the LF Bankruptcy Case to March 5, 2019 to follow the second 341a

15
meeting in the Debtor's case at 10 a.m. on March 5, 2019.  On February 22, 2019, my firm mailed

16
out over 500 notices to creditors in both bankruptcy cases.

17
4.      Debtor has filed its Schedules and Statement of Financial Affairs and expects to be

18
in full compliance with UST Guidelines this week

19
I declare under penalty of perjury under the laws of the United States of America that the

20
foregoing is true and correct.

21

22
DATED:   February 25, 2019                         /s/Marc C. Forsythe____

23
                                                   Marc C. Forsythe

24

25

26

27

28

# EXHIBIT A

**THIRD AMENDED AND RESTATED**

**LIMITED LIABILITY PARTNERSHIP AGREEMENT**

**OF**



**Effectively Dated**

**February 22, 2018**

THE PARTNERSHIP UNITS OF BP FISHER LAW GROUP, LLP HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES LAWS OF ANY STATE, PROVINCE OR ANY OTHER APPLICABLE SECURITIES LAWS AND ARE BEING SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH LAWS.  SUCH UNITS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR PROVINCE, AND ANY OTHER APPLICABLE SECURITIES LAWS; AND (II) THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT.  THE UNITS MAY NOT BE TRANSFERRED OF RECORD EXCEPT IN COMPLIANCE WITH SUCH LAWS AND THIS LIMITED PARTNERSHIP AGREEMENT.  THEREFORE, PURCHASERS AND OTHER TRANSFEREES OF SUCH UNITS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT OR ACQUISITION FOR AN INDEFINITE PERIOD OF TIME.

# Table of Contents

PREAMBLE                                                                6

ARTICLE I: DEFINITIONS                                                  6

    1.01  Definitions                                   7

ARTICLE II: FORMATION, NAME, PURPOSE AND POWERS                         14

    2.01  Formation                                     14

    2.02  Name                                          14

    2.03  Term                                          14

    2.04  Offices                                       14

    2.05  Agent for Service of Process                  14

    2.06  Purpose                                       14

    2.07  Powers of the Partnership                     15

ARTICLE III: MANAGEMENT                                                 15

    3.01  General Partner                               15

    3.02  Classes of Partnership                        16

    3.03  Officers                                      18

    3.04  Authority of Partners                         19

    3.05  Voting                                        23

    3.06  Amendment and Other Rights of the Limited Partners   23

    3.07  Partner Affiliation                           24

ARTICLE IV: DISTRIBUTIONS                                               24

    4.01  Distributions                                 24

    4.02  Guaranteed Distributions                      25

    4.03  Tax Distributions                             25

    4.04  Liquidation Distribution                      26

EXHIBIT "A"

4.05  Limitations on Distribution                                      26

ARTICLE V: CAPITAL CONTRIBUTIONS, CAPITAL ASSETS,

       TAX ALLOCATIONS, TAX MATTERS                           26

5.01  Initial Capital Contributions                                   26

5.02  No Interest on Capital                                          26

5.03  No Additional Capital Contributions Required                    26

5.04  Capital Accounts                                               26

5.05  Allocations of Profits and Losses                              27

5.06  Special Allocations                                            27

5.07  Tax Allocations                                                29

5.08  Tax Advances                                                   30

5.09  Tax Matters                                                    30

5.10  Other Allocation Provisions                                    31

ARTICLE VI: BOOKS, RECORDS AND REPORTS                               31

6.01  Books and Records                                              31

6.02  Furnishing of Financial Statements                             31

6.03  Filing of Tax Returns                                          32

6.04  Accounting Decisions                                           32

6.05  Other Papers                                                   32

ARTICLE VII: PARTNERSHIP UNITS                                       32

7.01  Units                                                         32

7.02  Register                                                      33

7.03  Registered Partners                                           33

ARTICLE VIII: ASSIGNMENT OF PARTNERSHIP INTERESTS                    33

8.01  Assignment of Limited Partners' Interests                      34

8.02  Rights of Assignees                                           34

| | |
|---|---|
| 8.03 Disability or Death | 34 |
| 8.04 Change in Control | 34 |
| 8.05 Substituted Limited Partners | 34 |
| 8.06 Admissions, Withdrawals and Removals | 35 |
| 8.07 Further Restrictions | 36 |
| 8.08 Withdrawal and Removal of Limited Partners | 36 |
| 8.09 Withdrawal and Liquidation of Equity Partner | 37 |
| 8.10 Liquidation Upon Death, Retirement or Withdrawal. | 37 |
| 8.11 Partnership Meetings Upon Withdrawal | 37 |
| ARTICLE IX: DISSOLUTION, LIQUIDATION AND TERMINATION | 37 |
| 9.01 Dissolution | 37 |
| 9.02 Events Causing Dissolution | 37 |
| 9.03 Distribution upon Dissolution | 38 |
| 9.04 Time for Liquidation | 39 |
| 9.05 Termination | 39 |
| 9.06 Claims of the Limited Partners | 39 |
| 9.07 Survival of Certain Provisions | 39 |
| ARTICLE X: LIABILITY AND INDEMNIFICATION | 39 |
| 10.01 Liability of Partners | 39 |
| 10.02 Indemnification | 41 |
| ARTICLE XI: MISCELLANEOUS | 44 |
| 11.01 Severability | 44 |
| 11.02 Notices | 44 |
| 11.03 Cumulative Remedies | 45 |
| 11.04 Binding Effect | 45 |

11.05  Interpretation                                                        45

11.06  Counterparts                                                          45

11.07  Further Assurances                                                    45

11.08  Entire Agreement                                                      45

11.09  Governing Law                                                         46

11.10  Submission to Jurisdiction; Waiver of Jury Trial                      46

11.11  Expenses                                                              47

11.12  Amendments and Waivers                                               47

11.13  No Third Party Beneficiaries                                          48

11.14  Headings                                                              49

11.15  Construction                                                          49

11.16  Power of Attorney                                                     49

11.17  Letter Agreements; Schedules                                         50

11.18  Partnership Status                                                    50

SIGNATURE PAGES                                                              51

EXHIBIT "A"                                                                 54

EXHIBIT "B"                                                                 55

EXHIBIT "C"                                                                 56

# THIRD AMENDED AND RESTATED

# LIMITED LIABILITY PARTNERSHIP AGREEMENT

# OF

# BP FISHER LAW GROUP, LLP

This THIRD AMENDED AND RESTATED LIMITED LIABILITY PARTNERSHIP AGREEMENT (**"Agreement"**) of BP Fisher Law Group, LLP (the **"Partnership"**) is made as of the 22nd day of February, 2018, by and among Plutos Sama, LLC, a Delaware limited liability company (the **"General Partner"**), Andrew Corcoran, Esquire and Shannon Kreshtool, Esquire (Plutos Sama, LLC, Andrew Corcoran, Esquire and Shannon Kreshtool, Esquire referred to herein as the **"Initial Equity Partners"**), and Lisbeth Merrill, Esquire (**"Participating Partner"**) (sometime all collectively referred to as **"Partners"**).

**WHEREAS**, the Partnership is the successor in interest to The Fisher Law Group, PLLC, a Maryland limited liability company, which such company was acquired by Plutos Sama, LLC on or about June 19, 2015;

**WHEREAS**, the Partnership was formed as a limited liability partnership pursuant to the Act, by the filing of certain Articles of Conversion and a Certificate of Limited Liability Partnership (the **"Certificate"**) with the Maryland Department of Assessment and Taxation on November 2, 2015; and

**WHEREAS**, the parties hereto desire to enter into this Limited Liability Partnership Agreement of the Partnership and to permit the admission of the Partners to the Partnership.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereby agree:

## ARTICLE 1
## DEFINITIONS

**1.01  Definitions.**  Capitalized terms used herein without definition have the following meanings (such meanings being equally applicable to both the singular and plural form of the terms defined):

EXHIBIT "A"

"Act" means, the Maryland Limited Partnership Act §10-101, *et seq.,* as it may be amended from time to time.

"Additional Credit Amount" has the meaning set forth in Section 4.03 (c).

"Adjusted Capital Account Balance" means, with respect to each Limited Partner, the balance in such Partner's Capital Account adjusted (i) by taking into account the adjustments, allocations and distributions described in U.S. Treasury Regulations Sections  1.704-1(b)(2)(ii)(c)(4), (5) and (6); and (ii) by adding to such balance such Limited Partner's share of Partnership Minimum Gain and Partner Nonrecourse Debt Minimum Gain, determined pursuant to Regulations Sections 1.704-2(g) and 1.704-2(i)(5), any amounts such Equity Partner is obligated to restore pursuant to applicable Law. The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate" means, with respect to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person.

"Agreement" has the meaning set forth in the preamble of this Agreement.

"Amended Tax Amount" has the meaning set forth in Section 4.03(c).

"Assumed Tax Rate"  means the highest effective marginal combined U.S. federal, state and local income tax rate for a Fiscal Year prescribed for an individual or corporate resident in National Harbor, Maryland (taking into account (a) the non-deductibility of expenses subject to the limitation described in Section 67(a) of the Code and (b) the character (e.g., long-term or short-term capital gain or ordinary or exempt income) of the applicable income, but not taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes). For the avoidance of doubt, the Assumed Tax Rate will be the same for all Equity Partners.

"Available Cash" means, with respect to any fiscal period, the amount of cash on hand which the General Partner, in its reasonable discretion, deems available for distribution to the Equity Partners, taking into account all debts, liabilities and obligations of the Partnership then due and amounts which the General Partner, in its reasonable discretion, deems necessary to

expend or retain for working capital or to place into reserves for customary and usual claims with respect to the Partnership's operations.

"Compensation Committee" A committee which shall be chaired and appointed by the Firm Managing Partner and shall meet and confer once a year to set annual compensation for all Partners and employees.  The appointed committee members shall consult and advise; all matters of compensation shall be decided by the Firm Managing Partner in accordance with Section 3.04 hereof.

"Capital Account" means the separate capital account maintained for each Equity Partner in accordance with Section 5.04 hereof.

"Capital Contribution" means, with respect to any Equity Partner, the aggregate amount of money contributed to the Partnership and the Carrying Value of any property (other than money), net of any liabilities assumed by the Partnership upon contribution or to which such property is subject, contributed to the Partnership pursuant to Article V.

"Carrying Value" means, with respect to any Partnership asset, the asset's adjusted basis for U.S. federal income tax purposes, except that the initial carrying value of assets contributed to the Partnership shall be their respective gross fair market values on the date of contribution as determined by the General Partner, and the Carrying Values of all Partnership assets shall be adjusted to equal their respective fair market values, in accordance with the rules set forth in United States Treasury Regulation Section 1.704-1(b)(2)(iv)(f), except as otherwise provided herein, as of: (a) the date of the acquisition of any additional Partnership Interest by any new or existing Equity Partner in exchange for more than a *de minimis* Capital Contribution; (b) the date of the distribution of more than a *de minimis* amount of Partnership assets to an Equity Partner; (c) the date a Partnership Interest is relinquished to the Partnership; or (d) any other date specified in the United States Treasury Regulations; provided, however, that adjustments pursuant to clauses (a), (b) (c) and (d) above shall be made only if such adjustments are deemed necessary or appropriate by the General Partner to reflect the relative economic interests of the Equity Partners.  The Carrying Value of any Partnership asset distributed to any Equity Partner shall be adjusted immediately before such distribution to equal its fair market value. In the case of any asset that has a Carrying Value that differs from its adjusted tax basis, Carrying Value shall be adjusted by the amount of depreciation calculated for purposes of the definition of

"Profits (Losses)" rather than the amount of depreciation determined for U.S. federal income tax purposes, and depreciation shall be calculated by reference to Carrying Value rather than tax basis once Carrying Value differs from tax basis.

"Cause" means the occurrence or existence of any of the following as determined fairly, reasonably, on an informed basis and in good faith by the General Partner:

(i)      any breach by a Partner of any provision of this Agreement;

(ii)     any material breach of any rules or regulations applicable to managing partners, directors or employees, as applicable, of BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities;

(iii)    a Partner's deliberate failure to perform his or her duties to BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities; or

(iv)    a Partner's committing to or engaging in any conduct or behavior that is or may be harmful to BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities in any material way (provided that, in the case of any of the foregoing clauses (i)-(iv), the General Partner has given the Partner written notice (a **"Notice of Breach"**) within fifteen (15) days after the General Partner becomes aware of such action and such Partner fails to cure such breach, failure to perform or conduct or behavior within fifteen (15) days after receipt by the Partner of such Notice of Breach from the General Partner (or such longer period as shall be reasonably required for such cure, <u>provided</u>, that such Partner is diligently pursuing such cure);

(v)     any act of fraud, misappropriation, dishonesty, embezzlement or similar conduct against BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities; or

(vi)    conviction (on the basis of a trial or by an accepted plea of guilty or *nolo contendere*) of a felony or crime (including any misdemeanor charge involving moral turpitude, false statements or misleading omissions, forgery, wrongful taking, embezzlement, extortion or bribery), or a determination by a court of competent jurisdiction, by a U.S. federal or state or comparable non-U.S. regulatory body or by a self-regulatory body having authority with

respect to U.S. federal or state or comparable non-U.S. securities laws, rules or regulations of the securities industry, that such Partner individually has violated any U.S. federal or state or comparable non-U.S. securities laws or any rules or regulations there under, or any rules of any such self-regulatory body (including, without limitation, any licensing requirement), if such conviction or determination has a material adverse effect on (A) such Partner's ability to function as a manger, director or employee, as applicable, of BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities, taking into account the services required of the Partner and the nature of the business of BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities or (B) the business of BP Fisher Law Group, LLP, its subsidiaries and its affiliated entities.

"Certificate" has the meaning set forth in the preamble of this Agreement.

"Change of Control" means the occurrence of any Person, other than a Person approved by the current Issuer General Partner, becoming the general partner of the Issuer.

"Class Units" means the classes of Units into which the interests in the Partnership may be classified or divided from time to time pursuant to the provisions of this Agreement.

"Class A Units" means the Units of partnership interest in the Partnership designated as the "Class A Units" herein and having the rights pertaining thereto as are set forth in this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Contingencies" has the meaning set forth in Section 9.03(i).

"Credit Amount" has the meaning set forth in Section 4.03 (c) of this Agreement.

"Disability" means, as to any Person, such Person's inability to perform in all material respects his or her duties and responsibilities to the Partnership, the General Partner, or any of its Affiliates, by reason of a physical or mental disability or infirmity which inability is reasonably expected to be permanent and has continued (i) for a period of six (6) consecutive months or (ii) such shorter period as the Equity Partners may reasonably determine in good faith.

"Dissolution Event" has the meaning set forth in Section 9.02 of this Agreement.

"Equity Partner" has the meaning as set forth in Section 3.02 (a) of this Agreement.

"Final Tax Amount" has the meaning set forth in Section 4.03(c).

"Fiscal Year" means (i) the period commencing upon the formation of the Partnership and ending on December 31, 2015 or (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31.

"GAAP" means accounting principles generally accepted in the United States of America as in effect from time to time.

"General Partner" means Plutos Sama, LLC, a limited liability company formed under the law of the State of Delaware or any successor general partner admitted to the Partnership in accordance with the terms of this Agreement.  For any state requiring that the General Partner be an individual, the General Partner means Matthew C. Browndorf, Esquire.

"Incapacity" means, with respect to any Person, the bankruptcy, dissolution, termination, entry of an order of incompetence, or the insanity, permanent disability or death of such Person.

"Initial Equity Partner" refers to those set forth in the Preamble of this Agreement.

"Intangible Assets" means the assets of the Partnership that are described in Section 197(d) of the Code.

"Intangible Asset Gain" means the net gain recognized by the Partnership with respect to the Partnership's Intangible Assets in connection with the actual or hypothetical sale of all or substantially all of the assets of the Partnership, including but not limited to net capital gain realized in connection with an adjustment to the Carrying Value of Partnership assets; provided, however, that any such gain shall constitute "Intangible Asset Gain" only to the extent that any such gain exceeds losses previously recognized in an actual or hypothetical sale of Intangible Assets.

"Law" means any statute, law, ordinance, regulation, rule, code, executive order, injunction, judgment, decree or other order issued or promulgated by any national, supranational, state, federal, provincial, local or municipal government or any administrative or regulatory body with authority there from with jurisdiction over the Partnership or any Partner, as the case may be.

"Limited Partner" means any Partner other than the General Partner, and without limitation, shall expressly include the Equity Partners.

"Liquidation Agent" has the meaning set forth in Section 9.03 of this Agreement.

"Net Taxable Income" has the meaning set forth in Section 4.03.

"Nonrecourse Deductions" has the meaning set forth in Treasury Regulations Section 1.704-2(b).  The amount of Nonrecourse Deductions of the Partnership for a fiscal year equals the net increase, if any, in the amount of Partnership Minimum Gain of the Partnership during that fiscal year, determined according to the provisions of Treasury Regulations Section 1.704-2(c).

"Participating Partner" has the meaning as set forth in Section 3.02 (b) of this Agreement.

"Partners" means, at any time, each person listed as a Partner (including the General Partner) on the books and records of the Partnership, in each case for so long as he, she or it remains a partner of the Partnership as provided hereunder.

"Partnership" has the meaning set forth in the preamble of this Agreement.

"Partnership Minimum Gain" has the meaning set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Partner Nonrecourse Debt Minimum Gain" means an amount with respect to each partner nonrecourse debt (as defined in Treasury Regulations Section 1.704-2(b)(4)) equal to the Partnership Minimum Gain that would result if such partner nonrecourse debt were treated as a nonrecourse liability (as defined in Treasury Regulations Section 1.752-1(a)(2)) determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"Partner Nonrecourse Deductions" has the meaning ascribed to the term "partner nonrecourse deductions" set forth in Treasury Regulations Section 1.704-2(i)(2).

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, limited company, joint venture, trust, unincorporated or governmental organization or any agency or political subdivision thereof.

"Professional Partners" has the meaning as set forth in Section 3.02 (c) of this Agreement.

"Profits" and "Losses" means, for each Fiscal Year or other period, the taxable income or loss of the Partnership, or particular items thereof, determined in accordance with the accounting method used by the Partnership for U.S. federal income tax purposes with the following adjustments: (a) all items of income, gain, loss or deduction allocated pursuant to Article V shall not be taken into account in computing such taxable income or loss; (b) any income of the Partnership that is exempt from U.S. federal income taxation and not otherwise taken into account in computing Profits and Losses shall be added to such taxable income or loss; (c) if the

Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, any gain or loss resulting from a disposition of such asset shall be calculated with reference to such Carrying Value; (d) upon an adjustment to the Carrying Value (other than an adjustment in respect of depreciation) of any asset, pursuant to the definition of Carrying Value, the amount of the adjustment shall be included as gain or loss in computing such taxable income or loss; (e) if the Carrying Value of any asset differs from its adjusted tax basis for U.S. federal income tax purposes, the amount of depreciation, amortization or cost recovery deductions with respect to such asset for purposes of determining Profits and Losses, if any, shall be an amount which bears the same ratio to such Carrying Value as the U.S. federal income tax depreciation, amortization or other cost recovery deductions bears to such adjusted tax basis (provided that if the U.S. federal income tax depreciation, amortization or other cost recovery deduction is zero, the General Partner may use any reasonable method for purposes of determining depreciation, amortization or other cost recovery deductions in calculating Profits and Losses); and (f) except for items in (a) above, any expenditures of the Partnership not deductible in computing taxable income or loss, not properly capitalizable and not otherwise taken into account in computing Profits and Losses pursuant to this definition shall be treated as deductible items.

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Tax Advances" has the meaning set forth in Section 5.08.

"Tax Amount" has the meaning set forth in Section 4.03(a).

"Tax Distributions" has the meaning set forth in Section 4.03.

"Tax Matters Partner" has the meaning set forth in Section 5.09.

"Total Percentage Interest" means, with respect to any Equity Partner, the quotient obtained by dividing the number of Units (vested or unvested) then owned by such Equity Partner by the number of Units then owned by all Equity Partners.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Units" means the Class A Units and any other Class of Units authorized in accordance with this Agreement, which shall constitute interests in the Partnership as provided in this Agreement and under the Act, entitling the holders thereof to the relative rights, title and

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T    **13** | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

interests in the profits, losses, deductions and credits of the Partnership at any particular time as set forth in this Agreement, and any and all other benefits to which a holder thereof may be entitled as a Partner as provided in this Agreement, together with the obligations of such Partner to comply with all terms and provisions of this Agreement.

## ARTICLE II
## FORMATION, NAME, PURPOSE AND POWERS

2.01 **Formation.**  The Partnership was formed as a limited liability partnership under the provisions of the Act by the filing on November 2, 2015 of the Certificate as provided in the preamble of this Agreement.  The rights and obligations of the Partners (definition section) shall be as stated in the Act except as otherwise provided herein.

2.02 **Name.**  The name of the Partnership shall be and the business of the Partnership shall be conducted under the name of, BP Fisher Law Group, LLP.

2.03 **Term.**  The term of the Partnership commenced on the date of the filing of the Certificate, and the term shall continue until the dissolution of the Partnership in accordance with Article IX.  The existence of the Partnership shall continue until cancellation of the Certificate in the manner required by the Act.

2.04 **Offices.**  The Partnership may have offices at such places either within or outside the State of Maryland as the Equity Partners (as defined herein) from time to time may select.

2.05 **Agent for Service of Process.**  The Partnership's registered agent for service of process in the State of Maryland shall be as set forth in the Certificate, as the same may be amended by the Equity Partners from time to time.

2.06 **Purpose.**  The principal business of the Partnership is to undertake and perform certain legal services as described in this Agreement and to engage in any and all activities that may be related or incidental thereto.  The Partnership shall not engage in any other business or activity.

2.07 **Powers of the Partnership.**  Subject to the limitations set forth in this Agreement, the Partnership will possess and may exercise all of the powers and privileges granted to it by the

Act including, without limitation, the ownership and operation of the assets contributed to the Partnership by the Initial Equity Partners, by any other Law or this Agreement, together with all powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the purpose of the Partnership set forth in Section 2.06.

## ARTICLE III
## MANAGEMENT

**3.01  General Partner.**  The General Partner shall have all the rights and powers of a general partner as provided in the Act.  The General Partner shall also be (and shall be treated as) a Limited Partner to the extent, if any, that it shall acquire a Partnership Interest in the Partnership under this Agreement.  To the extent that any state that the Partnership conducts business within, that requires the General Partner to be an individual, then the General Partner shall be Matthew C. Browndorf.  For purposes of this Agreement, the General Partner is Plutos Sama, LLC and acts as a holding company of the Partnership.

    (a)    Rights and Powers.  The General Partner shall appoint a Firm Managing Partner to manage the business, property and affairs of the Partnership, which whom may also, from time to time, delegate authority to officers or to others to act on behalf of the Partnership.  Without limiting the foregoing, the General Partner is granted and shall have the right and power to perform, in the name and on behalf of the Partnership, all acts which in its judgment are necessary and desirable to carry out the Partnership's business including without limitation the following powers:

    (i)    to employ agents, employees, independent contractors, brokers, attorneys and accountants, any and all of whom may be Affiliates of the Partners, to assist in or take responsibility for the management of the Partnership's benefits and payroll system and, in each such instance, to pay such Persons reasonable compensation therefore;

    (ii)    to develop and prepare a business plan each year which will set forth the operating goals and plans for the Partnership;

EXHIBIT "A"

     (iii)   to execute and deliver or to authorize the execution and delivery of contracts, deeds, leases, licenses, instruments of transfer and other documents on behalf of the Partnership;

     (iv)   the making of any expenditures, the lending or borrowing of money, the assumption or guarantee of, or other contracting for, indebtedness and other liabilities, the issuance of evidences of indebtedness and the incurring of any other obligations;

     (v)   to establish and enforce limits of authority and internal controls with respect to all personnel and function;

     (vi)   to develop or cause to be developed accounting procedures for the maintenance of the Partnership's books;

     (vii)   to commence or defend litigation with respect to the Partnership or any Partnership Property; to compromise, settle, arbitrate, or otherwise adjust claims in favor of or against the Partnership; and to insure Partnership Property and actions and undertakings of the Partnership and Limited Partners against any and all risks relating to the business of the Partnership;

     (viii)   to make investments in government obligations, bank certificates of deposit, short-term debt securities, and short-term commercial paper pending investment or reinvestment of funds of the Partnership or to provide funds from which to meet contingencies; and

Generally, do all things consistent with any and all of the foregoing on behalf of the Partnership.

     (b)   <u>Compensation.</u>  The General Partner shall not be entitled to any compensation for services rendered to the Partnership in its capacity as General Partner.

     **3.02**  **<u>Classes of Partnership.</u>**  There shall be three tiers of Partners: (1) Equity Partners, (2) Participating Partners, and (3) Professional Partners.  The rights, duties and liabilities of the Partners shall be as provided in the Act, except as is otherwise expressly provided herein, and the Partners consent to the variation of such rights, duties and liabilities as provided herein.

     (a)   <u>Equity Partners</u>.  A list of the Equity Partners is attached hereto as Exhibit "A".  The Equity Partners shall be required to make a Capital Contribution

either monetarily or by tangible personal property to the extent set forth on Exhibit A.  Equity Partners shall have full advisory, participation and voting rights as set forth herein, including but not limited to:

(i)     casting a vote at all Partnership Meetings based on their respective interest in the Partnership;

(ii)    sharing in the Profits and Losses of the Partnership;

(iii)   inviting a Participating Partner or Professional Partner to become an Equity Partner;

(iv)    admitting additional Partners to the Partnership in accordance with the terms of this Agreement; and

(v)     determining the extent to which Participating Partners may receive compensation for profits earned by the Partnership from clientele originated by said Partners.

Notwithstanding anything herein to the contrary, an Equity Partner's rights to vote and otherwise participate in the Partnership shall be limited to least extent necessary to prevent such Equity Partner from being treated as a general partner pursuant to the Act or other applicable law and this Agreement shall be so construed.

(b)   <u>Participating Partners.</u>  A list of the Participating Partners is attached hereto as Exhibit "B".  Participating Partners shall not be required to make a Capital Contribution to the Partnership.  Participating Partners shall have limited participation rights as specifically defined in a separate Participating Partnership Agreement between the Partnership and them.  Subject to the above, Participating Partners:

(i)     shall not share in the Profits and Losses of the Partnership;

(ii)    shall have the right to attend Partnership Meetings;

(iii)   shall be required to sign this Agreement due to the anticipation of becoming Equity Partners in the future; and

(iv)  shall be able to cast an advisory vote at Partnership Meetings for information purposes only.  Such vote shall not be counted towards any final advisory decisions made for or on behalf of the Partnership.

(c)  <u>Professional Partners.</u>  Upon the designation of any Professional Partners, a complete list will be affixed hereto as Exhibit "C".  Professional Partners shall be in name only and shall only hold those powers expressly stated hereunder. Professional Partners:

(i)  shall be able to attend Partnership Meetings, but will have no authority to cast any advisory vote, whether for information purposes or otherwise;

(ii)  shall not share in the Profits and Losses of the Partnership;

(iii)  shall not be required to contribute a Capital Contribution to the Partnership; and

(iv)  shall be entitled to view this Agreement, but are not required to sign it.

**3.03  <u>Officers.</u>**  Subject to the direction of the Firm Managing Partner, the day-to-day administration of the business of the Partnership may be carried out by employees and agents who may be designated as officers by the Firm Managing Partner.  The officers of the Partnership shall have titles and powers and perform those duties as shall be determined from time to time by the Firm Managing Partner and otherwise as shall customarily pertain to such offices.  Any number of offices may be held by the same person.  All employees, agents and officers shall be subject to the supervision and direction of the Firm Managing Partner and may be removed from such office by the Firm Managing Partner and the authority, duties or responsibilities of any employee, agent or officer of the Partnership may be suspended by the Firm Managing Partner from time to time, in each case at his sole discretion.  No officer of the Partnership, in its capacity as such, shall be considered a general partner of the Partnership by agreement, estoppel, as a result of the performance of its duties hereunder or otherwise.

(a)  <u>Firm Managing Partner.</u>  Matthew C. Browndorf shall act as the Firm Managing Partner of the Partnership.

(b)  <u>Office Managing Partners.</u>  The following attorneys shall be designated as the initial Office Managing Partners of their respective law office locations:

(1)    Matthew Browndorf; New York, NY; Philadelphia, PA; and Lambertville, NJ;

(2)    Lisbeth Merrill; Irvine, California; and

(3)    Andrew Corcoran and Shannon Kreshtool, jointly; National Harbor, MD for DC and MD, respectively.

(c)    <u>Equity Partners.</u>  The following individuals shall serve as the Initial Equity Partners of the Partnership:

(1)    Plutos Sama, LLC;

(2)    Andrew Corcoran; and

(3)    Shannon Kreshtool.

(d)    <u>Participating Partners.</u>  The following individuals shall serve as the initial Participating Partners of the Partnership:

(1)    Lisbeth Merrill.

(e)    <u>Professional Partners.</u>  The following individuals shall serve as the initial Professional Partners of the Partnership:

(1)    None.

**3.04  <u>Authority of Partners.</u>**  No Partner, in its capacity as such, shall participate in or have any control over the business of the Partnership, except as otherwise expressly provided herein.

(a)    <u>Firm Managing Partner.</u>  The Firm Managing Partner shall have all the rights and powers of a managing partner as provided in the Act and shall be entitled to compensation for services rendered.  The Firm Managing Partner, in his capacity as such, shall have the express authority to manage the business, property and affairs of the Partnership, including, but not limited to the following:

(i)    Appoint the Office Managing Partners and the chair position for each Office Managing Partner;

(ii)    Execute for and on behalf of the Partnership, and in accordance with the terms of this Agreement, deeds absolute, mortgages (which term "mortgages" is hereby defined for all purposes of this Agreement to include Deeds of Trust, financing statements, chattel mortgages,

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T    **19** | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

pledges, conditional sales contracts, and similar security instruments), leases, contracts, promissory notes, or other legal documents all of which instruments so duly executed as provided herein shall be valid and binding upon the Partnership;

(iii)    Cause the Partnership to enter into leases of real or personal property in furtherance of any or all of the purposes of the Partnership;

(iv)    Cause the Partnership to purchase real property or personal property and to make reasonable and necessary capital expenditures and improvements with respect to such property for use in connection with the operation and management of the Partnership's business; to finance such purchases or expenditures, in whole or in part, by giving the seller or any other Person a security interest in the property purchased;

(v)    Open accounts and deposit and maintain funds in the name of the Partnership in banks, savings and loan associations, money market funds, or such other financial instruments as the Firm Managing Partner deems necessary or appropriate;

(vi)    Pay all costs or expenses connected with the operation or management of the Partnership, including all debts and other obligations of the Company, from its bank accounts by check or other customary means (without commingling with the funds of any other Person);

(vii)    Enter into, perform and carry out contracts with any Person, including any of the Partners or Affiliates of the Partners, at reasonably competitive rates of compensation for the performance of any and all services that may at any time be necessary, proper, convenient or advisable to carry on the Partnership's business, including entering into exclusive and non-exclusive arrangements;

(viii)    Monitor the quality of services and products provided by vendors to the Partnership, and add, discharge, or replace such vendors as needed in accordance with applicable state law;

(ix)    Employ or engage Persons in the operation and management of the Partnership's business, on such terms and for such reasonable

compensation as they shall determine (at arm's length prices and in keeping with comparable salaries for comparable work), in good faith, to be appropriate and in the best interests of the Partnership;

(x)    Oversee and evaluate the performance of all employees, and agents of the Partnership, including its officers, and monitor the quality of services provided by employees and agents of the Partnership;

(xi)   Apply for, make proffers and commitments with regard to and obtain any and all governmental permits, approvals, licenses necessary and appropriate in connection with or in any way related to the Partnership's business;

(xii)  Place and carry malpractice liability, workmen's compensation, fire, extended coverage, business interruptions, errors and omissions and such other insurance as may be necessary or appropriate for the protection of the interests and property of the Partnership and the General Partner shall timely inform the other Partners, from time to time, if any of the above mentioned types of insurance is not carried or if the amount of such coverage is reduced;

(xiii) Deal directly with any relevant state and United States regulatory authorities on behalf of the Partnership and render decisions with respect to matters involving such authorities;

(xiv)  Cause the Partnership to create one or more wholly or partially owned domestic or foreign subsidiaries, which may be corporations, limited liability companies or other forms of business entities;

(xv)   Enter into agreements with the Partners as appropriate;

(xvi)  Prepare, maintain, file and disseminate returns, reports, statements, and other information for distribution to the Internal Revenue Service, the Maryland State Department of Taxation and Finance or Maryland Department of State, the Limited Partners and for submission to any governmental or regulatory authority or agency;

(xvii) Keep adequate books and records reflecting all financial activities of the Partnership on the accrual basis of accounting;

(xviii)    Set the salaries and compensation of all employees and Partners of the Partnership, including that of the Firm Managing Partner;

(xix) Set the Guaranteed Distribution amounts to Equity Partners in accordance with Section 4.02; and

Generally, do all things consistent with any and all of the foregoing on behalf of the Partnership.

(b)    <u>Office Managing Partners.</u>  The Office Managing Partners, in their individual capacity as such, shall have authority to manage the business, property and affairs of their particular Law Office upon the express approval of the Firm Managing Partner, including but not limited to the following:

(i)    Enter into, perform and carry out contracts with any Person at reasonably competitive rates of compensation for the performance of any and all services that may at any time be necessary, proper, convenient or advisable to carry on the Partnership's business within that particular Law Office;

(ii)    Monitor the quality of services and products provided by vendors to their particular Law Office, and add, discharge, or replace such vendors as needed in accordance with applicable state law;

(iii)    Employ or engage Persons in the operation and management of the particular Law Office's business, on such terms and for such reasonable compensation as shall be determined by the Firm Managing Partner (at arm's length prices and in keeping with comparable salaries for comparable work), in good faith, to be appropriate and in the best interests of the Partnership as a whole;

(iv)    Oversee and evaluate the performance of all employees, and agents of the particular Law Office and monitor the quality of services provided by those employees and agents; and

(v)    Generally, do all things consistent with any and all of the foregoing on behalf of the particular Law Office.

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T    **22** | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

3.05  **Voting.**  Subject to the provisions and limitations of Section 3.02(a), the Equity Partners shall have full voting rights as set forth in this Agreement based on their respective interest in the Partnership.

3.06  **Amendment and Other Rights of the Limited Partners.**

(a)    Removal of the Firm Managing Partner.  Subject to Section 3.05, a majority in interest of the Equity Partners may remove the Firm Managing Partner and elect a new managing partner if, and only if, the Firm Managing Partner has acted or failed to act and thereby caused material, adverse consequences to the Partnership, and such act or omission was performed or omitted fraudulently, in bad faith or in breach of the Firm Managing Partner's fiduciary duties.

(b)    Death of a Partner.  In the event of the death of a Partner, it is agreed that the Partnership will continue and that the deceased Partner's share of the business will be available for purchase by the remaining Partners on the date of the death.

In the case of the death of an Equity Partner, the Deceased Equity Partner's estate will be purchased in accordance with Section 8.10.  However, at no time will the Deceased Equity Partner's surviving heirs hold any rights afforded the Equity Partners as set forth herein.

(c)    Amendments to this Agreement.  With the consent of the majority in interest of the Equity Partners, the General Partner or the Firm Managing Partner may:

(i)    Add to the representations, duties or obligations of the Firm Managing Partner or surrender any right or power granted to the Firm Managing Partner herein for the benefit of the Partners;

(ii)    Cure any ambiguity, correct or supplement any provision herein which may be inconsistent with any other provisions herein, or add any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement;

(iii)    Delete any provision required to be so deleted by a state securities or similar official, or add any provision required by such an official to be

added, which addition or deletion is deemed by such official to be for the benefit or protection of the Partners;

Provided further, however, that no amendment shall be adopted pursuant to this Section unless the adoption thereof (i) does not alter the interest of any Partner in Profits, Losses or Capital Contribution; (ii) does not convert a Participating or Professional Partner's Interest into an Equity Partner's Interest or in any other respect modify the limited liability of any Partner; and (iii) does not adversely affect the tax status of the Partnership as a partnership for federal income tax purposes.

**3.07** **Partner Affiliation.** Partners, other than Partners who do not receive a salary, shall be precluded from working for, with or through any law firm other than BP Fisher Law Group, LLP or its Affiliates, or deriving any income, in any form therefrom, whether as an employee, consultant, independent contractor or otherwise without the express, written consent of the Firm Managing Partner. Partners, other than Partners who do not receive a salary, agree to have their books, accounts, tax returns, bank statements, and other financial records audited by a forensic auditor of the Firm Managing Partner's choosing and at his discretion in order to verify compliance with this Section.

## ARTICLE IV
## DISTRIBUTIONS

**4.01** **Distributions.** The Profits and Losses of the Partnership for each calendar year shall, after payment of all Partnership expenses, be distributed to the Equity Partners within thirty (30) days after the end of the calendar year. Each such distribution shall be made *pro rata* in accordance with the Equity Partners' respective Total Percentage Interests. Each distribution with respect to any interest or portion thereof of an Equity Partner which may have been assigned during a fiscal year shall be made entirely to the Equity Partner who is the recognized owner of such interest or portion thereof as of the date such distribution is made. Any distribution which an Equity Partner may be entitled pursuant to this Section 4.01 shall be reduced by the amount distributed to said Equity Partner pursuant to Section 4.02.

**4.02** **Guaranteed Distributions.** At the beginning of each calendar year, or, as to a newly admitted Equity Partner, upon their admission as such to the Partnership, the Firm

Managing Partner shall set the Guaranteed Distribution amount for each Equity Partner, if any, in his sole discretion.

     **4.03**  **Tax Distributions.**  In addition to the foregoing, if the General Partner reasonably determines that the taxable income of the Partnership for a Fiscal Year will give rise to taxable income for the Equity Partners (**"Net Taxable Income"**), the General Partner shall cause the Partnership to distribute Available Cash in respect of income tax liabilities (**"Tax Distributions"**) to the extent that other distributions made by the Partnership for such year were otherwise insufficient to cover such tax liabilities, provided that distributions and allocations related to such distributions, shall not be taken into account for purposes of this Section.

(a)     The Tax Distributions payable with respect to any Fiscal Year shall be computed based upon the General Partner's estimate of the allocable Net Taxable Income in accordance with Article V, multiplied by the Assumed Tax Rate (**"Tax Amount"**).

(b)     Tax Distributions shall be calculated and paid no later than one day prior to each quarterly due date for the payment by corporations on a calendar year of estimated taxes under the Code in the following manner (A) for the first quarterly period, 25% of the Tax Amount, (B) for the second quarterly period, 50% of the Tax Amount, less the prior Tax Distributions for the Fiscal Year, (C) for the third quarterly period, 75% of the Tax Amount, less the prior Tax Distributions for the Fiscal Year and (D) for the fourth quarterly period, 100% of the Tax Amount, less the prior Tax Distributions for the Fiscal Year.

(c)     Following each Fiscal Year, and no later than one day prior to the due date for the payment by corporations of income taxes for such Fiscal Year, the General Partner shall make an amended calculation of the Tax Amount for such Fiscal Year (**"Amended Tax Amount"**), and shall cause the Partnership to distribute a Tax Distribution, out of Available Cash, to the extent that the Amended Tax Amount so calculated exceeds the cumulative Tax Distributions previously made by the Partnership in respect of such Fiscal Year.  If the Amended Tax Amount is less than the cumulative Tax Distributions previously made by the Partnership in respect of the relevant Fiscal Year, then the difference (the **"Credit Amount"**) shall be applied

against, and shall reduce, the amount of Tax Distributions made for subsequent Fiscal Years.  Within thirty (30) days following the date on which the Partnership files a tax return on Form 1065, the General Partner shall make a final calculation of the Tax Amount of such Fiscal Year (the **"Final Tax Amount"**) and shall cause the Partnership to distribute a Tax Distribution, out of Available Cash, to the extent that the Final Tax Amount so calculated exceeds the Amended Tax Amount. If the Final Tax Amount is less than the Amended Tax Amount in respect of the relevant Fiscal Year, then the difference (**"Additional Credit Amount"**) shall be applied against, and shall reduce, the amount of Tax Distributions made for subsequent Fiscal Years.  Any Credit Amount and Additional Credit Amount applied against future Tax Distributions shall be treated as an amount actually distributed pursuant to this Section 4.03(c) for purposes of the computations herein.

**4.04  Liquidation Distribution.**  Distributions made upon dissolution of the Partnership shall be made as provided in Article IX.

**4.05  Limitations on Distribution.**  Notwithstanding any provision to the contrary contained in this Agreement, the General Partner shall not make a Partnership distribution to any Equity Partner if such distribution would violate Section 731 through 733 of the Code or other applicable Law.

## ARTICLE V
## CAPITAL CONTRIBUTIONS;
## CAPITAL ACCOUNTS; TAX ALLOCATIONS; TAX MATTERS

**5.01  Initial Capital Contributions.**  Only the Equity Partners shall be required to contribute a Capital Contribution to the Partnership.  The name, business address and Capital Contribution of the Equity Partners are set forth in Exhibit "A".  Concurrently with the execution and delivery of this Agreement the Initial Equity Partners have contributed such Capital Contributions in full, in cash, to the capital of the Partnership.  Any Capital Contributions obtained from future Equity Partners shall be specified in the books and records of the Partnership.

5.02 __No Interest on Capital.__  No Equity Partner shall be entitled to interest on any Capital Contribution or on such Partner's Capital Account, notwithstanding any disproportion that may from time to time exist therein as among the Equity Partners.

5.03 __No Additional Capital Contributions Required.__  No Equity Partner shall be required to make any additional Capital Contribution to the Partnership.

5.04 __Capital Accounts.__  A separate capital account (__"Capital Account"__) shall be established and maintained for each Equity Partner in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv).  The Capital Account of each Equity Partner shall be credited with such Partner's Capital Contributions, if any, all Profits allocated to such Equity Partner pursuant to Section 5.05, and any items of income or gain which are specially allocated pursuant to Section 5.06; and shall be debited with all Losses allocated to such Equity Partner pursuant to Section 5.05, any items of loss, or deduction of the Partnership specially allocated to such Equity Partner pursuant to Section 5.06, and all cash and the Carrying Value of any property (net of liabilities assumed by such Equity Partner and the liabilities to which such property is subject) distributed by the Partnership to such Equity Partner.  Any references in any section of this Agreement to the Capital Account of an Equity Partner shall be deemed to refer to such Capital Account as the same may be credited or debited from time to time as set forth above.  In the event of any transfer of any interest in the Partnership in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

5.05 __Allocations of Profits and Losses.__  Equity Partners shall have full profit participation rights in the Partnership as set forth herein.  Except as otherwise provided in this Agreement pursuant to Sections 4.01 and 4.02, Profits and Losses (and, to the extent necessary, individual items of income, gain or loss or deduction of the Partnership) shall be allocated in a manner such that the Capital Account of each Equity Partner after giving effect to the Special Allocations set forth in Section 5.06 is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made pursuant to Article IV if the Partnership were dissolved, its affairs wound up and its assets sold for cash equal to their Carrying Value, all Partnership liabilities were satisfied (limited with respect to each non-recourse liability to the Carrying Value of the assets securing such liability) and the net assets of the Partnership were distributed to the Equity Partners pursuant to this Agreement, _minus_ (ii) such Equity Partner's share of Partnership

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T    **27** | P a g e
B P F L G | F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

Minimum Gain and Partner Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.  Notwithstanding the foregoing, the General Partner shall make such adjustments to Capital Accounts as it determines in its sole discretion to be appropriate to ensure allocations are made in accordance with a partner's interest in the Partnership.

      **5.06**  **Special Allocations.**  Notwithstanding any other provision in this Article V:

      (a)    <u>Minimum Gain Chargeback</u>.  If there is a net decrease in Partnership Minimum Gain or Partner Nonrecourse Debt Minimum Gain (determined in accordance with the principles of Treasury Regulations Sections 1.704-2(d) and 1.704-2(i)) during any Partnership taxable year, the Equity Partners shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to their respective shares of such net decrease during such year, determined pursuant to Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(f).  This Section 5.06(a) is intended to comply with the minimum gain chargeback requirements in such Treasury Regulations Sections and shall be interpreted consistently therewith; including that no chargeback shall be required to the extent of the exceptions provided in Treasury Regulations Sections 1.704-2(f) and 1.704-2(i)(4).

      (b)    <u>Qualified Income Offset</u>.  If any Equity Partner unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Partnership income and gain shall be specially allocated to such Equity Partner in an amount and manner sufficient to eliminate the deficit balance in such Partner's Adjusted Capital Account Balance created by such adjustments, allocations or distributions as promptly as possible; <u>provided</u> that an allocation pursuant to this Section 5.06(b) shall be made only to the extent that an Equity Partner would have a deficit Adjusted Capital Account Balance in excess of such sum after all other allocations provided for in this Article V have been tentatively made as if this Section 5.06(b) were not in this Agreement.  This Section

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T   **28** | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

5.06(b) is intended to comply with the "qualified income offset" requirement of the Code and shall be interpreted consistently therewith.

(c)    <u>Gross Income Allocation</u>.  If any Equity Partner has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Equity Partner is obligated to restore, if any, pursuant to any provision of this Agreement, and (ii) the amount such Equity Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5), each such Equity Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 5.06(c) shall be made only if and to the extent that an Equity Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article V have been tentatively made as if Section 5.06(b) and this Section 5.06(c) were not in this Agreement.

(d)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions shall be allocated to the Equity Partners in accordance with their respective Total Percentage Interests.

(e)    <u>Partner Nonrecourse Deductions</u>.  Partner Nonrecourse Deductions for any taxable period shall be allocated to the Equity Partner who bears the economic risk of loss with respect to the liability to which such Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(j).

(f)    <u>Creditable Non-U.S. Taxes</u>.  Creditable Non-U.S. Taxes for any taxable period attributable to the Partnership, or an entity owned directly or indirectly by the Partnership, shall be allocated to the Equity Partners in proportion to the partners' distributive shares of income (including income allocated pursuant to Section 704(c) of the Code) to which the Creditable Non-U.S. Tax relates (under principles of Treasury Regulations Section 1.904-6).  The provisions of this Section 5.06(f) are intended to comply with the provisions of Temporary Treasury Regulations Section 1.704-1T(b)(4)(xi), and shall be interpreted consistently therewith.

(g)    <u>Ameliorative Allocations</u>. Any special allocations of income or gain pursuant to Sections 5.06(b) or 5.06(c) hereof shall be taken into account in computing subsequent allocations pursuant to Section 5.05 and this Section 5.06(g), so that the net amount of any items so allocated and all other items allocated to each Equity Partner shall, to the extent possible, be equal to the net amount that would have been allocated to each Equity Partner if such allocations pursuant to Sections 5.06(b) or 5.06(c) had not occurred.

5.07    <u>**Tax Allocations.**</u>    For income tax purposes, each item of income, gain, loss and deduction of the Partnership shall be allocated among the Equity Partners in the same manner as the corresponding items of Profits and Losses and specially allocated items are allocated for Capital Account purposes; <u>provided</u> that in the case of any asset the Carrying Value of which differs from its adjusted tax basis for U.S. federal income tax purposes, income, gain, loss, and deduction with respect to such asset shall be allocated solely for income tax purposes in accordance with the principles of Sections 704(b) and (c) of the Code (in any manner determined by the General Partner and permitted by the Code and Treasury Regulations) so as to take account of the difference between Carrying Value and adjusted basis of such asset.  Notwithstanding the foregoing, the General Partner shall make such allocations for tax purposes as it determines in its sole discretion to be appropriate to ensure allocations are made in accordance with a partner's interest in the Partnership.

5.08    <u>**Tax Advances.**</u>    To the extent the General Partner reasonably believes that the Partnership is required by law to withhold or to make tax payments on behalf of or with respect to any Equity Partner or the Partnership is subjected to tax itself by reason of the status of any Partner (**"Tax Advances"**), the General Partner may withhold such amounts and make such tax payments as so required.  All Tax Advances made on behalf of an Equity Partner shall be repaid by reducing the amount of the current or next succeeding distribution or distributions which would otherwise have been made to such Equity Partner or, if such distributions are not sufficient for that purpose, by so reducing the proceeds of liquidation otherwise payable to such Equity Partner.  For all purposes of this Agreement such Equity Partner shall be treated as having received the amount of the distribution that is equal to the Tax Advance.  Each Equity Partner hereby agrees to indemnify and hold harmless the Partnership and the other Equity Partners from and against any liability (including, without limitation, any liability for taxes, penalties, additions

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T    **30** | P a g e
B P F L G  |  F e b r u a r y  2 2 ,  2 0 1 8
EXHIBIT "A"

to tax or interest other than any penalties, additions to tax or interest imposed as a result of the Partnership's failure to withhold or make a tax payment on behalf of such Equity Partner which withholding or payment is required pursuant to applicable Law but only to the extent amounts sufficient to pay such taxes were not timely distributed to the Equity Partner pursuant to Section 4.03(b)) with respect to income attributable to or distributions or other payments to such Equity Partner.

      **5.09** **<u>Tax Matters.</u>** The General Partner shall be the initial "tax matters partner" within the meaning of Section 6231(a)(7) of the Code (the **"Tax Matters Partner"**). The Partnership shall file as a partnership for federal, state, provincial and local income tax purposes, except where otherwise required by Law. All elections required or permitted to be made by the Partnership, and all other tax decisions and determinations relating to federal, state, provincial or local tax matters of the Partnership, shall be made by the Tax Matters Partner, in consultation with the Partnership's attorneys and/or accountants. Tax audits, controversies and litigations shall be conducted under the direction of the Tax Matters Partner. The Tax Matters Partner shall keep the other Partners reasonably informed as to any tax actions, examinations or proceedings relating to the Partnership and shall submit to the Equity Partners, for their review and comment, any settlement or compromise offer with respect to any disputed item of income, gain, loss, deduction or credit of the Partnership. As soon as reasonably practicable after the end of each Fiscal Year, the Partnership shall send to each Equity Partner a copy of U.S. Internal Revenue Service Schedule K-1, and any comparable statements required by applicable U.S. state or local income tax Law as a result of the Partnership's activities or investments, with respect to such Fiscal Year. The Partnership also shall provide the Partners with such other information as may be reasonably requested for purposes of allowing the Partners to prepare and file their own tax returns.

      **5.10** **<u>Other Allocation Provisions.</u>** Certain of the foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such regulations. Sections 5.04, 5.05 and 5.06 may be amended at any time by the General Partner and Firm Managing Partner if necessary, in the opinion of tax counsel to the Partnership, to comply with such regulations or any applicable Law, so long as any such amendment does not materially change the relative economic interests of the Partners.

## ARTICLE VI
## BOOKS, RECORDS AND REPORTS

**6.01  Books and Records.**  At all times during the continuance of the Partnership, the Partnership shall prepare and maintain separate books of account and records reflecting all financial activities of the Partnership in accordance with GAAP.

**6.02  Furnishing of Financial Statements.**  The Firm Managing Partner shall, within thirty (30) days after the close of each fiscal year, furnish to each Partner:

   (i)    An annual report containing a balance sheet and income statement for such year, and

   (ii)   Information necessary for preparation of such Partner's federal income tax return with respect to such fiscal year which is relevant to such Partner for federal income tax purposes.

**6.03  Filing of Tax Returns.**  The Firm Managing Partner shall cause the Partnership to file a federal partnership income tax return and all other tax returns required to be filed by the Partnership for each fiscal year.

**6.04  Accounting Decisions.**  All decisions as to accounting principles, except as specifically provided to the contrary herein, shall be made by the Firm Managing Partner, which decisions must be acceptable to the Partnership's independent certified public accountants.

**6.05  Other Papers.**  Each Partner shall have the right to receive, for a purpose reasonably related to such Partner's interest as a Partner in the Partnership or the Partner's practice of law, upon reasonable written demand stating the purpose of such demand and at such Partner's own expense:

   (i)    a copy of the Certificate and this Agreement and all amendments thereto, together with a copy of the executed copies of all powers of attorney pursuant to which the Certificate and this Agreement and all amendments thereto have been executed;

   (ii)   promptly after becoming available, copies of the Partnership's federal, state and local income tax returns and reports, if any, for the three most recent years;

   (iii)  Copies of income and expense reports, as well as balance sheets;

   (iv)   Copies of insurance policies maintained by the Partnership;

EXHIBIT "A"

     (v)       Such information as reasonably necessary for a Partner to conduct conflict checks; and

     (vi)      Such other information as the Partner establishes a reasonable need reasonably related to such Partner's interest as a Partner in the Partnership or the Partner's practice of law.

**6.06  Other Reports.**  The General Partner shall keep the Partners reasonably informed of the affairs of the Partnership, including without limitation, (i) any legal action threatened or brought against the Partnership, and (ii) any event that could reasonably be expected to have a material adverse effect on the Partnership or the Partners.

## ARTICLE VII
## PARTNERSHIP UNITS

**7.01  Units.**  Interests in the Partnership shall be represented by Units.  The Units initially are comprised of one Class: Class A Units, of which there shall be 100 Units.  The Equity Partners may establish, from time to time in accordance with such procedures as they shall determine from time to time, other Classes, one or more series of any such Classes, or other Partnership securities with such designations, preferences, rights, powers and duties (which may be senior to existing Classes and series of Units or other Partnership securities), as shall be determined by them, including:

     (i)       the right to share in Profits and Losses or items thereof;

     (ii)      the right to share in Partnership distributions;

     (iii)     the rights upon dissolution and liquidation of the Partnership;

     (iv)     whether, and the terms and conditions upon which, the Partnership may or shall be required to redeem the Units or other Partnership securities (including sinking fund provisions);

     (v)      whether such Unit or other Partnership security is issued with the privilege of conversion or exchange and, if so, the terms and conditions of such conversion or exchange;

     (vi)     the terms and conditions upon which each Unit or other Partnership security will be issued, evidenced by certificates and assigned or transferred;

(vii)   the method for determining the Total Percentage Interest as to such Units or other Partnership securities; and

(viii)  the right, if any, of the holder of each such Unit or other Partnership security to vote on Partnership matters, including matters relating to the relative designations, preferences, rights, powers and duties of such Units or other Partnership securities.

Except as expressly provided in this Agreement to the contrary, any reference to "Units" shall include the Class A Units and any other Classes that may be established in accordance with this Agreement.  All Units of a particular Class shall have identical rights in all respects as all other Units of such Class, except in each case as otherwise specified in this Agreement.

**7.02  Register.**  The register of the Partnership shall be the definitive record of ownership of each Unit and all relevant information with respect to each Partner.  Unless the Equity Partners shall determine otherwise, Units shall be uncertificated and recorded in the books and records of the Partnership.

**7.03  Registered Partners.**  The Partnership shall be entitled to recognize the exclusive right of a Person registered on its records as the owner of Units for all purposes and shall not be bound to recognize any equitable or other claim to or interest in Units on the part of any other Person, whether or not it shall have express or other notice thereof, except as otherwise provided by the Act or other applicable Law.

## ARTICLE VIII
## ASSIGNMENT OF PARTNERSHIP INTERESTS

**8.01  Assignment of Equity Partners' Interests.**  An Equity Partner shall have the right to assign all or any part of his or its Interest in the Partnership only by a written assignment, the terms of which are not in contravention of any of the provision of this Agreement, which assignment has been duly executed by the assignor and assignee, received by the Partnership and recorded on the books of the Partnership and approved in the sole and unfettered discretion of the Firm Managing Partner, which approval may be withheld for any reason.  As used herein, the "Effective Date" of an assignment of a Partnership Interest shall be the date as of which all of the requirements expressed herein for an assignment shall have been met.

A General Partner shall not assign all or any part of its Partnership Interest without the prior written consent or ratification of the Equity Partners.

**8.02  Rights of Assignees.**  Anything herein to the contrary notwithstanding, both the Partnership and the General Partner shall be entitled to treat the assignor of such Partnership Interest as the absolute owner thereof in all respects and shall incur no liability for distributions of cash or other property made in good faith to such assignor, until such time as the written assignment has been received by the Partnership and recorded on the books of the Partnership.

However, the General Partner may not refuse to record an assignment on the books of the Partnership unless it reasonably believes the assignment to be illegal, void or otherwise not in compliance with the terms hereof.

An assignee of an Equity Partner's Interest in the Partnership shall be entitled to receive the distributions and allocations provided herein attributable to the Interest acquired by reason of such assignment which are distributed or allocated from and after the Effective Date of the assignment of such Interest to it, but shall have no other rights hereunder.

**8.03  Disability or Death.**  Notwithstanding Section 8.01 above, if earlier, upon the death or Disability of a Partner, such Partner may transfer at any time and from time to time up to 100% of its Partnership Interest.

**8.04  Change in Control.**  Upon the occurrence of a Change in Control, any Partner may transfer at any time and from time to time up to 100% of its Partnership Interest.

**8.05  Substituted Limited Partners.**  No assignee shall have the right to become a Substituted Limited Partner except upon the written consent of the Equity Partners, the granting or denying of which shall be within the Equity Partners' sole and absolute discretion. In addition, the admission of an assignee as a Substituted Limited Partner shall be further conditioned as follows:

(i)     The assignment instrument and such other instruments as the Equity Partners may deem necessary or desirable to effect the admission of the assignee as a Substituted Limited Partner being in form and substance satisfactory to the Equity Partners;

EXHIBIT "A"

(ii)    The assignee's written acceptance and adoption of all the terms and provisions of this Agreement, as it may have been amended;

(iii)   The assignee and/or the assignor paying or obligating himself or themselves to pay all reasonable expenses connected with such admission (as determined solely by the Equity Partners) including without limitation the cost of the preparation, filing and publishing of any appropriate documents; and

(iv)    Such other conditions as the Equity Partners may impose.

An assignee who does not become a Substituted Limited Partner shall have no right to require any information or account of Partnership transactions, to vote on Partnership matters, to request a meeting of the Partnership, or to exercise any of the other rights of a Partner other than to receive the distributions and allocations as provided hereunder.

8.06    **Admissions, Withdrawals and Removals.**    No Person may be admitted to the Partnership as an additional General Partner or substitute General Partner without the prior written consent or ratification of the Equity Partners.

(a)    A General Partner shall not withdraw from being a General Partner without the written consent of the Equity Partners, unless another General Partner has been admitted hereunder (and not have previously been removed or withdrawn).

(b)    No Partner will be removed or entitled to withdraw from being a Partner of the Partnership except in accordance with Sections 8.08 and 8.09 hereof.

(c)    Except as otherwise provided in Article IX or the Act, no admission, substitution, withdrawal or removal of a Partner will cause the dissolution of the Partnership.  To the fullest extent permitted by law, any purported admission, withdrawal or removal that is not in accordance with this Agreement shall be null and void.

8.07    **Further Restrictions.**    Notwithstanding any contrary provision in this Agreement, in no event may any Assignment of an Interest be made by any Partner or Assignee if:

EXHIBIT "A"

(a)     No transfer or assignment of any Partnership Interest may be made if such transfer or assignment, together with all other transfers and assignments of Interest within the preceding twelve months would, in the opinion of counsel for the Partnership, result in a termination of the Partnership for purposes of Section 708 of the Code or any comparable provision then in effect.

(b)     No transfer or assignment of any Partnership Interest may be made if, in the opinion of counsel for the Partnership, such transfer or assignment would violate the Securities Act of 1933, as amended, or applicable state securities laws or any other applicable provision of law in any respect.

(c)     No transfer or assignment of any Partnership Interest may be made if, in the opinion of counsel for the Partnership, such transfer and assignment would cause the Partnership to be treated as an association taxable as a corporation rather than as a partnership subject to the provisions of Subchapter K of the Internal Revenue Code of 1986, or any comparable provision then in effect.

(d)     In no event shall any Partnership Interest or any portion thereof be assigned or transferred to a minor or an incompetent or in violation of any State or Federal law. Any such attempted sale, transfer or assignment shall be void and ineffectual and shall not bind the Partnership or the General Partner.

**8.08** **Withdrawal and Removal of Limited Partners.** If an Equity Partner ceases to hold any Class Units, then such Equity Partner shall withdraw from the Partnership and shall cease to be a Partner and to have the power to exercise any rights or powers of a Partner.

**8.09** **Withdrawal and Liquidation of Equity Partner.** An Equity Partner shall have the right to withdraw from the Partnership and to be compensated for the Class Units owned at the time of withdrawal pursuant to Section 8.10.

**8.10** **Liquidation Upon Death, Retirement or Withdrawal.** A deceased, retiring or withdrawing Equity Partner under Section 8.09 may elect to be compensated for the Class Units owned as follows: Over a period of five (5) years, at twenty percent (20%) per year and based upon an EBITDA (earnings before interest, taxes, depreciation, and amortization) averaged over three (3) years (the current year, the last year and the future year), with a multiple of five (5). The EBITDA calculation shall be made by the Firm Managing Partner and verified by a compilation from a Certified Public Accountant.

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T     37 | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

    **8.11** **Partnership Meetings Upon Withdrawal.** A withdrawn Equity Partner under Section 8.10 may attend Partnership Meetings for one (1) year following his withdrawal.

### ARTICLE IX
### DISSOLUTION, LIQUIDATION AND TERMINATION

    **9.01** **Dissolution.** Except as required by the Act, Partnership shall not be dissolved by the admission of additional Partners or withdrawal of Partners in accordance with the terms of this Agreement. The Partnership may be dissolved, liquidated wound up and terminated only pursuant to the provisions of this Article IX, and the Partners hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Partnership or a sale or partition of any or all of the Partnership assets.

    **9.02** **Events Causing Dissolution.** Upon the happening of any one of the following events the Partnership shall be dissolved and its affairs shall be wound up (**"Dissolution Event"**):

        (i)        the entry of a decree of judicial dissolution of the Partnership under the Act upon the finding by a court of competent jurisdiction that the General Partner (i) is permanently incapable of performing its part of this Agreement, (ii) has been guilty of conduct that is calculated to affect prejudicially the carrying on of the business of the Partnership, (iii) willfully or persistently commits a breach of this Agreement or (iv) conducts itself in a manner relating to the Partnership or its business such that it is not reasonably practicable for the other Partners to carry on the business of the Partnership with the General Partner;

        (ii)      any event which makes it unlawful for the business of the Partnership to be carried on by the Partners;

        (iii)     the written consent of all Partners;

        (iv)     any other event not inconsistent with any provision hereof causing a dissolution of the Partnership under the Act;

        (v)      the Incapacity or removal of the last remaining and sole General Partner, unless within 120 days thereafter if: (i) at the time of the occurrence or event there is at least one other general partner of the Partnership who is hereby

EXHIBIT "A"

authorized to, and elects to, carry on the business of the Partnership; or (ii) a majority in interest of the remaining Equity Partners consent to or ratify the continuation of the business of the Partnership and the appointment of another general partner of the Partnership.

**9.03** **Distribution upon Dissolution.**  Upon dissolution, the Partnership shall not be terminated and shall continue until the winding up of the affairs of the Partnership is completed. Upon the winding up of the Partnership, the General Partner, or any other Person designated by the General Partner (the **"Liquidation Agent"**), shall take full account of the assets and liabilities of the Partnership and shall, unless the General Partner determines otherwise, liquidate the assets of the Partnership as promptly as is consistent with obtaining the fair value thereof. The proceeds of any liquidation shall be applied and distributed in the following order:

(i)     First, to the satisfaction of debts and liabilities of the Partnership (including satisfaction of all indebtedness to Partners and/or their Affiliates to the extent otherwise permitted by law) including the expenses of liquidation, and including the establishment of any reserve which the Liquidation Agent shall deem reasonably necessary for any contingent, conditional or unmatured contractual liabilities or obligations of the Partnership (**"Contingencies"**). Any such reserve may be paid over by the Liquidation Agent to any attorney-at-law, or acceptable party, as escrow agent, to be held for disbursement in payment of any Contingencies and, at the expiration of such period as shall be deemed advisable by the Liquidation Agent for distribution of the balance in the manner hereinafter provided in this Section 9.03; and

(ii)    The balance, if any, to the Equity Partners, *pro rata* to each of the Equity Partners in accordance with their Total Percentage Interests.

**9.04** **Time for Liquidation.**  A reasonable amount of time shall be allowed for the orderly liquidation of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the Liquidation Agent to minimize the losses attendant upon such liquidation.

**9.05** **Termination.**  The Partnership shall terminate when all of the assets of the Partnership, after payment of or due provision for all debts, liabilities and obligations of the Partnership, shall have been distributed to the holders of Class Units in the manner provided for

EXHIBIT "A"

in this Article IX, and the Certificate shall have been cancelled in the manner required by the Act.

      **9.06**  **Claims of the Limited Partners.**  The Equity Partners shall look solely to the Partnership's assets for the return of their Capital Contributions, and if the assets of the Partnership remaining after payment of or due provision for all debts, liabilities and obligations of the Partnership are insufficient to return such Capital Contributions, the Equity Partners shall have no recourse against the Partnership or any other Partner or any other Person. No Equity Partner with a negative balance in such Partner's Capital Account shall have any obligation to the Partnership or to the other Partners or to any creditor or other Person to restore such negative balance during the existence of the Partnership, upon dissolution or termination of the Partnership or otherwise, except to the extent required by the Act.

      **9.07**  **Survival of Certain Provisions.**  Notwithstanding anything to the contrary in this Agreement, the provisions of Section 10.02 and Section 11.09 shall survive the termination of the Partnership.

## ARTICLE X
## LIABILITY AND INDEMNIFICATION

      **10.01**  **Liability of Partners.**

    (a)      No Partner shall be liable for any debt, obligation or liability of the Partnership or of any other Partner or have any obligation to restore any deficit balance in its Capital Account solely by reason of being a Partner of the Partnership, except to the extent required by the Act.

    (b)      This Agreement is not intended to, and does not, create or impose any fiduciary duty on any of the Partners (including without limitation, the General Partner) hereto or on their respective Affiliates.  Further, the Partners hereby waive any and all fiduciary duties that, absent such waiver, may exist at or be implied by Law or in equity, and in doing so, recognize, acknowledge and agree that their duties and obligations to one another and to the Partnership are only as expressly set forth in this Agreement and those required by the Act.

(c)     To the extent that, at law or in equity, any Partner (including without limitation, the General Partner) has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to another Partner, the Partners (including without limitation, the General Partner) acting under this Agreement will not be liable to the Partnership or to any such other Partner for their good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities relating thereto of any Partner (including without limitation, the General Partner) otherwise existing at law or in equity, are agreed by the Partners to replace to that extent such other duties and liabilities of the Partners relating thereto (including without limitation, the General Partner).

(d)     The General Partner may consult with legal counsel, accountants and financial or other advisors and any act or omission suffered or taken by the General Partner on behalf of the Partnership or in furtherance of the interests of the Partnership in good faith in reliance upon and in accordance with the advice of such counsel, accountants or financial or other advisors will be full justification for any such act or omission, and the General Partner will be fully protected in so acting or omitting to act so long as such counsel or accountants or financial or other advisors were selected with reasonable care.

(e)     Notwithstanding any other provision of this Agreement or otherwise applicable provision of law or equity, whenever in this Agreement the General Partner and/or Firm Managing Partner is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, such General Partner and/or Firm Managing Partner shall be entitled to consider only such interests and factors as they desires, including their own interests, and shall, to the fullest extent permitted by applicable Law, have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership or the Partners, or (ii) in their "good faith" or under another expressed standard, they shall act under such express standard and shall not be subject to any other or different standards.

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T     **41** | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

**10.02  Indemnification.**

    (a)    <u>Indemnification</u>. To the fullest extent permitted by law, the Partnership shall indemnify any person (and such person's heirs, executors or administrators) who was or is made or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding (brought in the right of the Partnership or otherwise), whether civil, criminal, administrative or investigative, and whether formal or informal, including appeals, by reason of the fact that such person, or a person for whom such person was the legal representative, is or was a Partner (including without limitation, the General Partner) or a director, officer or agent of a Partner (including without limitation, the General Partner) or the Partnership or, while a director, officer or agent of a Partner (including without limitation, the General Partner) or the Partnership, is or was serving at the request of the Partnership as a director, officer, partner, trustee, employee or agent of another corporation, partnership, joint venture, trust, limited liability company, nonprofit entity or other enterprise, for and against all loss and liability suffered and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement reasonably incurred by such person or such heirs, executors or administrators in connection with such action, suit or proceeding, including appeals; <u>provided</u> that such person shall not be entitled to indemnification hereunder only to the extent such person's conduct constituted fraud, bad faith or willful misconduct.  Notwithstanding the preceding sentence, except as otherwise provided in Section 10.02(c), the Partnership shall be required to indemnify a person described in such sentence in connection with any action, suit or proceeding (or part thereof) commenced by such person only if the commencement of such action, suit or proceeding (or part thereof) by such person was authorized by the General Partner.

    (b)    <u>Advancement of Expenses</u>.  To the fullest extent permitted by law, the Partnership shall promptly pay expenses (including attorneys' fees) incurred by any person described in Section 10.02(a) in appearing at, participating in or defending any action, suit or proceeding in advance of the final disposition of

EXHIBIT "A"

such action, suit or proceeding, including appeals, upon presentation of an
undertaking on behalf of such person to repay such amount if it shall
ultimately be determined that such person is not entitled to be indemnified
under this Section 10.02 or otherwise.  Notwithstanding the preceding
sentence, except as otherwise provided in Section 10.02(c), the Partnership
shall be required to pay expenses of a person described in such sentence in
connection with any action, suit or proceeding (or part thereof) commenced by
such person only if the commencement of such action, suit or proceeding (or
part thereof) by such person was authorized by the General Partner.

(c)     <u>Insurance</u>.  To the fullest extent permitted by law, the Partnership may
purchase and maintain insurance on behalf of any person described in Section
10.02(a) against any liability asserted against such person, whether or not the
Partnership would have the power to indemnify such person against such
liability under the provisions of this Section 10.02 or otherwise.

(d)     <u>Non-Exclusivity of Rights</u>.  The provisions of this Section 10.02 shall be
applicable to all actions, claims, suits or proceedings made or commenced
after the date of this Agreement, whether arising from acts or omissions to act
occurring before or after its adoption.  The provisions of this Section 10.02
shall be deemed to be a contract between the Partnership and each person
entitled to indemnification under this Section 10.02 (or legal representative
thereof) who serves in such capacity at any time while this Section 10.02  and
the relevant provisions of applicable Law, if any, are in effect, and any
amendment, modification or repeal hereof shall not affect any rights or
obligations then existing with respect to any state of facts or any action, suit or
proceeding then or theretofore existing, or any action, suit or proceeding
thereafter brought or threatened based in whole or in part on any such state of
facts.  If any provision of this Section 10.02  shall be found to be invalid or
limited in application by reason of any law or regulation, it shall not affect the
validity of the remaining provisions hereof.  The rights of indemnification
provided in this Section 10.02 shall neither be exclusive of, nor be deemed in
limitation of, any rights to which any person may otherwise be or become

L I M I T E D   L I A B I L I T Y   P A R T N E R S H I P   A G R E E M E N T    **43** | P a g e
B P F L G  |  F e b r u a r y   2 2 ,   2 0 1 8
EXHIBIT "A"

entitled or permitted by contract, this Agreement or as a matter of law, both as to actions in such person's official capacity and actions in any other capacity, it being the policy of the Partnership that indemnification of any person whom the Partnership is obligated to indemnify pursuant to Section 10.02(a) shall be made to the fullest extent permitted by law.

For purposes of this Section 10.02, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; and references to "serving at the request of the Partnership" shall include any service as a director, officer, employee or agent of the Partnership which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries.

**THIS SECTION 10.02 SHALL NOT LIMIT THE RIGHT OF THE PARTNERSHIP, TO THE EXTENT AND IN THE MANNER PERMITTED BY LAW, TO INDEMNIFY AND TO ADVANCE EXPENSES TO, AND PURCHASE AND MAINTAIN INSURANCE ON BEHALF OF, PERSONS OTHER THAN PERSONS DESCRIBED IN SECTION 10.02 (a).**

### ARTICLE XI
### MISCELLANEOUS

**11.01  <u>Severability.</u>**  If any term or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced by any rule of Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions is not affected in any manner materially adverse to any party.  Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**11.02  Notices.**  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by courier service, by fax, by electronic mail (delivery receipt requested) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.02):

> (a)    If to the Partnership, to:
> BP Fisher Law Group, LLP
> c/o Matthew C. Browndorf
> 200 Park Avenue, Suite 1740
> New York, NY 10166
> Fax: (646) 513-3205

> (b)    If to any Partner, to:
> The Address for the Partner Specified on Exhibits A-C

> (c)    If to the General Partner, to:
> Plutos Sama, LLC
> c/o Matthew C. Browndorf
> 200 Park Avenue, Suite 1740
> New York, NY 10166
> Fax: (646) 513-3205

**11.03  Cumulative Remedies.** The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by Law.

**11.04  Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, executors, administrators, heirs, legal representatives and assigns.

**11.05  Interpretation.**  Throughout this Agreement, nouns, pronouns and verbs shall be construed as masculine, feminine, neuter, singular or plural, whichever shall be applicable. Unless otherwise specified, all references herein to "Articles," "Sections" and paragraphs shall refer to corresponding provisions of this Agreement.

11.06  **Counterparts.**  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 11.06.

11.07  **Further Assurances.**  Each Partner shall perform all other acts and execute and deliver all other documents as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

11.08  **Entire Agreement.**

(a)    This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

(b)    For the avoidance of doubt, each of the Partners that serve as a Firm Managing Partner of BP Fisher Law Group, LLP or its subsidiaries may from time to time enter into agreements with the Partnership in respect of the terms of such service.

11.09  **Governing Law.**  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York.

11.10  **Submission to Jurisdiction.**

(a)    Any and all disputes which cannot be settled amicably, including any ancillary claims of any party, arising out of, relating to or in connection with the validity, negotiation, execution, interpretation, performance or non-performance of this Agreement (including the validity, scope and enforceability of this arbitration provision) shall be finally settled by arbitration conducted by a single arbitrator in New York in accordance with the then-existing Rules of Arbitration of the International Chamber of Commerce.  If the parties to the dispute fail to agree on the selection of an arbitrator within thirty (30) days of the receipt of the request for arbitration, the International Chamber of Commerce shall make the appointment.  The

EXHIBIT "A"

arbitrator shall be a lawyer and shall conduct the proceedings in the English language.  Performance under this Agreement shall continue if reasonably possible during any arbitration proceedings.

(b)      Notwithstanding the provisions of paragraph (a), the General Partner may bring, or may cause the Partnership to bring, on behalf of the General Partner or the Partnership or on behalf of one or more Partners, an action or special proceeding in any court of competent jurisdiction for the purpose of compelling a party to arbitrate, seeking temporary or preliminary relief in aid of an arbitration hereunder, and/or enforcing an arbitration award and, for the purposes of this paragraph (b), each Partner (i) expressly consents to the application of paragraph (c) of this Section 11.10 to any such action or proceeding, (ii) agrees that proof shall not be required that monetary damages for breach of the provisions of this Agreement would be difficult to calculate and that remedies at law would be inadequate, and (iii) irrevocably appoints the Firm Managing Partner as such Partner's agent for service of process in connection with any such action or proceeding and agrees that service of process upon such agent, who shall promptly advise such Limited Partner of any such service of process, shall be deemed in every respect effective service of process upon the Limited Partner in any such action or proceeding.

(c)      EACH PARTNER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF COURTS LOCATED IN NEW YORK, NEW YORK FOR THE PURPOSE OF ANY JUDICIAL PROCEEDING BROUGHT IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION 11.10.

(d)      The parties acknowledge that the *fora* designated by paragraph (c) have a reasonable relation to this Agreement, and to the parties' relationship with one another.

(e)      Notwithstanding any provision of this Agreement to the contrary, this Section 11.10 shall be construed to comply with the laws of the State of New York. If, nevertheless, it shall be determined by a court of competent jurisdiction that any provision or wording of this Section 11.10 shall be invalid or unenforceable under applicable Law, such invalidity shall not invalidate all of

this Section 11.10.  In that case, this Section 11.10 shall be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of applicable Law, and, in the event such term of provisions cannot be so limited, this Section 11.10 shall be construed to omit such invalid or unenforceable provision.

11.11  **Expenses.**  Except as otherwise specified in this Agreement, the Partnership shall be responsible for all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with its operation.

11.12  **Amendments and Waivers.**

(a)    This Agreement (including the Annexes hereto) may be amended, supplemented, waived or modified by the written consent of the Equity Partners; provided that any amendment that would have a material adverse effect on the rights or preferences of any Class of Units in relation to other Classes of Units must be approved by the Equity Partners; provided further, that the Equity Partners may amend, supplement, waive or modify any provision of this Agreement and execute, swear to, acknowledge, deliver, file and record whatever documents may be required in connection therewith, to reflect: (i) any amendment, supplement, waiver or modification that the Equity Partners determine to be necessary or appropriate in connection with the creation, authorization or issuance of any class or series of equity interest in the Partnership; (ii) the admission, substitution, withdrawal or removal of Partners in accordance with this Agreement; (iii) a change in the name of the Partnership, the location of the principal place of business of the Partnership, the registered agent of the Partnership or the registered office of the Partnership; (iv) any amendment, supplement, waiver or modification that the Equity Partners determine in its discretion to be necessary or appropriate to address changes in U.S. federal income tax regulations, legislation or interpretation; (v) a change in the Fiscal Year or taxable year of the Partnership and any other changes that the Equity Partners determine to be necessary or appropriate as a result of a change in the Fiscal Year or taxable

EXHIBIT "A"

year of the Partnership including a change in the dates on which distributions are to be made by the Partnership.

(b)     No failure or delay by any party in exercising any right, power or privilege hereunder (other than a failure or delay beyond a period of time specified herein) shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

(c)     Except as may be otherwise required by law in connection with the winding-up, liquidation, or dissolution of the Partnership, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for judicial accounting or for partition of any of the Partnership's property.

**11.13  <u>No Third Party Beneficiaries.</u>**  This Agreement shall be binding upon and inure solely to the benefit of the Partners hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement (other than pursuant to Section 10.02 hereof).

**11.14  <u>Headings.</u>**  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

**11.15  <u>Construction.</u>**  Each Partner hereto acknowledges and agrees it has had the opportunity to draft, review and edit the language of this Agreement and that it is the intent of the Partners hereto that no presumption for or against any party arising out of drafting all or any part of this Agreement will be applied in any dispute relating to, in connection with or involving this Agreement. Accordingly, the Partners hereby waive to the fullest extent permitted by law the benefit of any rule of Law or any legal decision that would require that in cases of uncertainty, the language of a contract should be interpreted most strongly against the party who drafted such language.

**11.16  <u>Power of Attorney.</u>**  Each Partner, by its execution hereof, hereby irrevocably makes, constitutes and appoints the Firm Managing Partner as its true and lawful agent and attorney in fact, with full power of substitution and full power and authority in its name, place

EXHIBIT "A"

and stead, to make, execute, sign, acknowledge, swear to, record and file (a) the original certificate of limited partnership of the Partnership and all amendments thereto required or permitted by law or the provisions of this Agreement; (b) all certificates and other instruments (including consents and ratifications which the Partners have agreed to provide upon a matter receiving the agreed support of Partners) deemed advisable by the General Partner to carry out the provisions of this Agreement and Law or to permit the Partnership to become or to continue as a limited partnership or partnership wherein the Partners have limited liability in each jurisdiction where the Partnership may be doing business; (c) all instruments that the Equity Partners deems appropriate to reflect a change or modification of this Agreement or the Partnership in accordance with this Agreement, including, without limitation, the admission of additional Partners or Substituted Limited Partners pursuant to the provisions of this Agreement; (d) all conveyances and other instruments or papers deemed advisable by the Equity Partners to effect the liquidation and termination of the Partnership; and (e) all fictitious or assumed name certificates required or permitted (in light of the Partnership's activities) to be filed on behalf of the Partnership.

     **11.17  Letter Agreements; Schedules.**  The Equity Partners may, or may cause the Partnership to enter into separate letter agreements with individual Partners with respect to any matter, in each case on terms and conditions not inconsistent with this Agreement, which have the effect of establishing rights under, or supplementing the terms of, this Agreement.  The Equity Partners may from time to time execute and deliver to the Partners schedules which set forth information contained in the books and records of the Partnership and any other matters deemed appropriate by the Equity Partners.  Such schedules shall be for information purposes only and shall not be deemed to be part of this Agreement for any purpose whatsoever.

     **11.18  Partnership Status.**  The Partners intend to treat the Partnership as a partnership for U.S. federal income tax purposes.

# SIGNATURE PAGE

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement or have caused this Agreement to be duly executed by their respective authorized officers, in each case as of the date first above stated.

**BP FISHER LAW GROUP, LLP**

GENERAL PARTNER

By: _____
    Plutos Sama, LLC
    Matthew C. Browndorf
    *Managing Member*

INITIAL EQUITY PARTNERS

By: _____
    Plutos Sama, LLC
    Matthew C. Browndorf
    *Managing Member*

By: _____
    Andrew Corcoran, Esquire

By: _____
    Shannon Kreshtool, Esquire

EXHIBIT "A"

## SIGNATURE PAGE

### (Continued)

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement or have caused this Agreement to be duly executed by their respective authorized officers, in each case as of the date first above stated.

**BP FISHER LAW GROUP, LLP**

PARTICIPATING PARTNERS

By: _____

Name: Lisbeth Merrill, Esquire_____

EXHIBIT "A"

**SIGNATURE PAGE**

**(Continued)**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement or have caused this Agreement to be duly executed by their respective authorized officers, in each case as of the date first above stated.

**BP FISHER LAW GROUP, LLP**

PROFESSIONAL PARTNERS

By:    None
_____

Name:    _____

## EXHIBIT A

### Equity Partners

| Partner | Address | Class A Units | Capital Contribution |
|---|---|---|---|
| Plutos Sama, LLC | 200 Park Avenue, Suite 1740 New York, NY 10166 | 98 | $2,600,000 |
| Andrew Corcoran | 174 Waterfront St, Suite 400 National Harbor, MD 20745 | 1 [†] | $1 |
| Shannon Kreshtool | 174 Waterfront St, Suite 400 National Harbor, MD 20745 | 1 [†] | $1 |

† Class A Unit(s) automatically reverts to Plutos Sama, LLC upon the termination of the referenced Equity Partners' employment with BP Fisher Law Group, LLP.

**EXHIBIT B**
**Participating Partners**

| Partner | Address |
|---|---|
| Lisbeth Merrill | 1900 Main Street, Suite 610<br>Irvine, CA  92614 |

**EXHIBIT C**
**Professional Partners**

| Partner | Address |
|---------|---------|
| None | N/A |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 18101 Von Karman Avenue, Suite 1200, Irvine, CA 92612

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S SUR-REPLY IN OPPOSITION TO MOTION BY DITECH FINANCIAL, LLC TO DISMISS, OR IN THE ALTERNATIVE, TO TRANSFER VENUE; DECLARATIONS OF MATTHEW C. BROWNDORF AND MARC C. FORSYTHE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.    TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 25, 2019, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Frank Cadigan**    frank.cadigan@usdoj.gov
- **Marc C Forsythe**    kmurphy@goeforlaw.com, mforsythe@goeforlaw.com;goeforecf@gmail.com
- **Robert P Goe**    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;goeforecf@gmail.com
- **Marsha A Houston**    mhouston@reedsmith.com
- **Brian D Huben**    hubenb@ballardspahr.com, carolod@ballardspahr.com
- **Christopher O Rivas**    crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com
- **John D Sadler**    sadlerj@ballardspahr.com, andersonn@ballardspahr.com
- **Najah J Shariff**    najah.shariff@usdoj.gov, USACAC.criminal@usdoj.gov
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
- **Amelia B. Valenzuela**    avalenzuela@wedgewood-inc.com, dmarcus@wedgewood-inc.com;aguisinger@wedgewood-inc.com

**2.    SERVED BY UNITED STATES MAIL**:
On (*date*) February 25, 2019, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows: Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Jeffrey Fisher
155 Potomac Passage, No 214
Oxon Hill, MD 20745

☐    Service information continued on attached page

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:
(state the method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) February 25, 2019, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows:  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

- The Honorable Theodor C Albert, USBC, 411 West Fourth Street, Santa Ana, CA 92701

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 25, 2019 | Susan C. Stein | /s/Susan C. Stein |
|---|---|---|
| Date | Printed Name | Signature |

8